UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

          Plaintiff,

      -and-

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated*,

          Plaintiff-Intervenors,

      -against-

THE CITY OF NEW YORK,

          Defendant.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**
**13-CV-3123 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

     This Memorandum and Order addresses the Proposed Stipulation and Order ("Intent

Stipulation") (Dkt. 1291-1),[1] which Plaintiff-Intervenors[2] have moved the court to finally

---

[1] All citations to case documents refer to filings in No. 07-CV-2067 (NGG) (RLM) (E.D.N.Y.).

[2] Plaintiff-Intervenors are The Vulcan Society, Inc., for itself and on behalf of its members, Jamel Nicholson, and
Rusebell Wilson, individually and on behalf of a subclass of all other victims similarly situated seeking classwide
injunctive relief (the "Injunctive Relief Subclass"); Roger Gregg, Marcus Haywood, and Kevin Walker, individually
and on behalf of a subclass of all other non-hire victims similarly situated (the "Non-Hire Victim Subclass"); and
Candido Nuñez, and Kevin Simpkins, individually and on behalf of a subclass of all other delayed-hire victims
similarly situated (the "Delayed-Hire Victim Subclass").

approve and enter in order to resolve Plaintiff-Intervenors' intentional discrimination claims against Defendant City of New York (the "City") (Mot. for Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims ("First Mot. for Final Entry of Intent Stipulation") (Dkt. 1470); Mot. for Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims ("Second Mot. for Final Entry of Intent Stipulation") (Dkt. 1551)), and objections raised thereto. The court preliminarily approved and entered the Intent Stipulation on April 23, 2014. (Order (Dkt. 1293).) At two fairness hearings held October 1, 2014 (the "Fairness Hearing"), and February 20, 2015 (the "Supplemental Fairness Hearing"), the court heard oral argument by Plaintiff-Intervenors and the City in support of final approval and entry of the Intent Stipulation, and by objecting class members in opposition to the same. The court has also received class members' written objections. The court has considered all of the objections and concludes that they should be overruled. Accordingly, for the reasons discussed below, the court GRANTS Plaintiff-Intervenors' First and Second Motions for Final Entry of Intent Stipulation, and contemporaneously will approve and enter the Intent Stipulation.

## I.  BACKGROUND

### A.    Factual and Procedural Background[3]

In 2007, Plaintiff United States of America (the "United States") brought suit against the City, alleging that certain aspects of the City's policies for selecting entry-level firefighters for the New York City Fire Department ("FDNY") violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as amended. (Compl. (Dkt. 1).) Specifically, the United States alleged that the City's pass-fail and rank-order use of Written Exams 7029 and 2043 had an unlawful disparate impact on black and Hispanic candidates for entry-level

---

[3] The factual and procedural background of this case is extensive. Events relevant to the issues currently before the court will be summarized here; a full recount can be found in the court's previous rulings.

firefighter positions.  (See id. ¶ 1.)  The Vulcan Society, Inc. and several individuals

(collectively, "Plaintiff-Intervenors") intervened as plaintiffs, alleging similar disparate impact

claims and also alleging claims of disparate treatment on behalf of a class of black entry-level

firefighter candidates, bringing all claims under various federal, state, and local laws.  (See

Sept. 5, 2007, Mem. & Order (Dkt. 47) (granting motion to intervene).)

Proceedings were bifurcated.  In July 2009, the court granted summary judgment in favor

of the United States' and Plaintiff-Intervenors' Title VII disparate impact claims, finding the City

liable.  (July 22, 2009, Mem. & Order (Dkt. 294).)  The court concluded that absent the

discriminatory examinations, 293 additional black and Hispanic applicants would have been

appointed as entry-level firefighters, and 249 black and Hispanic entry-level firefighters who

were appointed would have been appointed earlier—approximately 69 years earlier, in

aggregate.  (Id. at 20-22, 27.)  Subsequently, in January 2010, the court granted summary

judgment in favor of Plaintiff-Intervenors' various disparate treatment claims, and Plaintiff-

Intervenors' disparate impact claims brought pursuant to the New York State Human Rights Law

(the "State HRL") and New York City Human Rights Law (the "City HRL").[4]  (Jan. 13, 2010,

Mem. & Order (Dkt. 385).)

Proceeding next to the remedial phase of the case, the court issued an Initial Remedial

Order (Dkt. 390).  The Initial Remedial Order explained that claimants were entitled to two

broad categories of relief: (1) prospective injunctive relief to ensure future compliance with

Title VII; and (2) individual compensatory, "make whole" relief for the individual victims of the

---

[4]  In 2009, the court had certified, for the liability phase of Plaintiff-Intervenors' disparate treatment and disparate impact claims, a Rule 23(b)(2) mandatory class of all black firefighter applicants who sat for Written Exam 7029 or 2043 and who were harmed by the pass-fail or rank-order use of these exams.  (See Liability Certification Order (Dkt. 281) at 34.)  The certification of this class, for the purpose of seeking injunctive relief only, with the Vulcan Society, Inc., Jamel Nicholson, and Rusebell Wilson serving as class representatives (the "Injunctive Relief Subclass"), was later continued for the remedial phase.  (See Initial Remedial Order (Dkt. 390); First Remedial Certification Order (Dkt. 640) at 27-28, 29-30; Second Remedial Certification Order (Dkt. 665) at 55; Remedial Order & Partial J., Permanent Inj., & Order Appointing Ct. Monitor (Dkt. 765) ¶ 83.)

City's discrimination. Individual compensatory relief would include monetary relief, priority hiring relief, and retroactive seniority.

In August 2011, the court held a remedial-phase bench trial, addressing the need for and scope of permanent injunctive relief. (See Findings of Fact as to Injunctive Relief (Dkt. 741); Oct. 5, 2011, Mem. & Order (Dkt. 743).) The court ordered prospective injunctive relief in a Remedial Order and Partial Judgment, Permanent Injunction, & Order Appointing Court Monitor ("Remedial Order") (Dkt. 765). The court appointed a Court Monitor to oversee the City's compliance with the Remedial Order. (See id. ¶ 6.)

On appeal, the Second Circuit reversed the court's granting of summary judgment only with respect to Plaintiff-Intervenors' disparate treatment claims, finding that a trial was needed to determine whether the City had acted with discriminatory intent. See United States v. City of New York, 717 F.3d 72, 89-91 (2d Cir. 2013). The Second Circuit also directed modification of certain provisions of the Remedial Order. See id. at 95-99. This court issued a Modified Remedial Order and Partial Judgment, Permanent Injunction, & Order Appointing Court Monitor ("Modified Remedial Order") (Dkt. 1143) on June 6, 2013, which incorporated the Second Circuit's modifications as well as proposed amendments from the Court Monitor and the parties. The parties and the Court Monitor continue to work actively to ensure the City's compliance with the provisions of the Modified Remedial Order. (See, e.g., Ct. Monitor's Tenth Periodic Report (Dkt. 1533); Ct. Monitor's Eleventh Periodic Report (Dkt. 1575); Ct. Monitor's EEO Report (Dkt. 1463); Ct. Monitor's Recruitment Report (Dkt. 1464).) The City's liability for compensatory "make whole" relief was not affected by the Second Circuit's ruling, as claimants' entitlement to compensatory relief flowed directly from the disparate impact liability. (See Mar. 8, 2012, Mem. & Order ("Backpay Summ. J. Op.") (Dkt. 825) at 62.)

On remand, Plaintiff-Intervenors and the City reached an agreement to settle Plaintiff-Intervenors' disparate treatment claims through injunctive relief. (See Mar. 18, 2014, Ltr. (Dkt. 1281).) On April 22, 2014, they jointly moved for preliminary approval and entry of the Intent Stipulation (Apr. 22, 2014, Ltr. Mot. (Dkt. 1291)), which the court granted (Apr. 23, 2014, Order (Dkt. 1293). After a notice-and-objection period, Plaintiff-Intervenors moved for final approval and entry of the Intent Stipulation.[5] (First Mot. for Final Entry of Intent Stipulation.) The court held a Fairness Hearing on October 1, 2014, at which Plaintiff-Intervenors and the City argued in support of final entry of the Intent Stipulation, and some class members lodged oral objections thereto. (Oct. 10, 2014, Min. Entry.) The court held open the record until October 15, 2014, at 5:00 p.m., for any additional written statements in support of or opposition to final approval and entry of the Intent Stipulation. (Id.)

Subsequently, on December 1, 2014, in accordance with the court's direction, Plaintiff-Intervenors and the City submitted a proposal regarding the provision of notice of the Intent Stipulation and a supplemental fairness hearing to 23 class members who had not previously received proper notice thereof. (See Nov. 13, 2014, Order (Dkt. 1517); Dec. 1, 2014, Ltr. (Dkt. 1527).) The court approved the proposal submitted by the parties and scheduled the Supplemental Fairness Hearing. (Dec. 10, 2014, Order.) The court held the Supplemental Fairness Hearing on February 20, 2015, at which, after remarks by the court, Plaintiff-Intervenors and the City again spoke in support of final entry of the Intent Stipulation. (Feb. 23, 2015, Min. Entry.) Time was made available for comments by class members who received the supplemental notice; however, no class members requested speaking time or

---

[5] The City does not formally join in Plaintiff-Intervenors' First or Second Motion for Final Entry of Intent Stipulation, but it does not oppose the relief requested (Sept. 22, 2014, Ltr. (Dkt. 1473)), and it argued in support of final entry at the Fairness Hearing and Supplemental Fairness Hearing.

appeared at the hearing.  (Id.)  The court reserved judgment on the requests for final approval

and entry of the Intent Stipulation.

*     *     *

The many aspects of the individual compensatory relief flowing from the City's disparate

impact liability have been addressed in numerous court rulings and filings.   In brief, this

category of relief includes wage backpay, fringe benefits, prejudgment interest, priority hiring

relief, retroactive seniority (including both "benefits seniority" and "competitive seniority"), and

limited forms of compensatory damages for noneconomic harm for certain eligible claimants.

(See Final Relief Order (Dkt. 1012) (setting forth framework of claims process for individual

compensatory relief).)  As a general matter, this individual compensatory relief is unrelated to

the court's assessment of the Intent Stipulation and to this Memorandum and Order.   However,

in one important respect, appreciating the posture of the individual monetary relief claims

process is necessary in order to contextualize certain objections lodged to the Intent Stipulation.

In September 2010, the United States, joined in part by Plaintiff-Intervenors, had moved

for summary judgment regarding the City's total monetary liability for backpay, benefits, and

interest.  (Pl.'s Mot. for Summ. J. with Respect to Backpay & Benefits (Dkt. 534); see also Pl.-

Intervenors' Mem. of Law in Supp. of Mot. for Summ. J. with Respect to Class-Wide Back Pay

(Dkt. 540).)  In March 2012, the court denied the motion, but held that the United States and

Plaintiff-Intervenors had established the total aggregate amount of pre-mitigation wage backpay

owed by the City through the end of 2010 ($128,696,803—allocated among eight categories of

eligible claimants), and it set initial eligibility criteria for individual monetary relief.  (Backpay

Summ. J. Op.)  The court also held that the City would have the chance to reduce this aggregate

amount by proving in individual proceedings that claimants had either mitigated their losses

6

through interim employment or violated their duty to mitigate.  (Id. at 48-51.)  The court's Final Relief Order, issued in October 2012, reiterated these findings and set forth the framework of the claims process for individual compensatory relief.  (See Final Relief Order; Mem. & Order Addressing Objections to Proposed Relief Order (Dkt. 1011) (discussing contemporaneously issued Final Relief Order).)

The portion of the claims process dedicated to the adjudication of individual monetary relief began in earnest in April 2013.  (See June 24, 2013, Report and Recommendation ("R&R") of the Special Masters (Dkt. 1150) at 3-12.)  In August 2013, the parties reported that they anticipated settling the individual monetary claims, and accordingly, they sought a stay of most case-related deadlines; the court stayed in primary part the individual monetary claims process. (Aug. 21, 2013, Order (Dkt. 1191) (Filed Under Seal).)

The parties ultimately reached an agreement to settle the United States' and Plaintiff-Intervenors' claims for backpay and fringe benefits, including interest thereon, and in June 2014, jointly moved the court to provisionally approve and enter the Monetary Relief Consent Decree ("MRCD") (Dkt. 1435).  (Joint Mot. for Provisional Entry of MRCD & Scheduling of Fairness Hr'g (Dkt. 1433).)  On March 11, 2015, the court finally approved and entered an amended version of the MRCD, the Amended Monetary Relief Consent Decree ("AMRCD"). (Mar. 11, 2015, Mem. & Order (Dkt. 1571).)  These are discrete and independent settlement agreements; however, the Intent Stipulation and the AMRCD were both discussed at the October 1, 2014, Fairness Hearing.[6]  (See Oct. 10, 2014, Min. Entry.)  Additionally, the original notice-and-objection period for the two settlement agreements overlapped, and all class members who received notice and an objection form with respect to the Intent Stipulation also received

---

[6] For detailed information regarding the AMRCD, see the court's Memorandum and Order dated March 11, 2015.

notice and an objection form with respect to the MRCD.[7]  As discussed in greater detail below, certain claimants appear to have lodged objections addressed in substance to the MRCD on forms designated for objections to the Intent Stipulation.  See infra Part III.B.2.

**B.      Terms of Intent Stipulation**

The Intent Stipulation resolves through prospective injunctive relief Plaintiff-Intervenors' claims of intentional discrimination brought pursuant to Title VII, 42 U.S.C. §§ 1981 and 1983, and the State and City HRLs.  The parties have already begun to implement the settlement on a voluntary basis.  (See Supp. Hr'g Tr.[8] at 5:3-6:24; Ct. Monitor's Tenth Periodic Report at 3-5; Ct. Monitor's Eleventh Periodic Report at 4-5, 8-10; May 7, 2014, Status Conf. Tr. at 17-26.)

The principal terms of the Intent Stipulation include the following.

1.      Recruitment

"The City will use its best efforts to recruit black test-takers for open-competitive firefighter entrance exams in proportions closely approximating the representation of age-eligible blacks in the New York City labor market, plus an additional 3% to remedy a history of underrepresentation of blacks in the New York City firefighter ranks."  (Intent Stipulation ¶ 1(a).)

2.      Chief Diversity and Inclusion Officer and Diversity Advocate

The City agrees to create two new appointed positions that are intended to facilitate an environment of diversity and inclusion at the FDNY.  Specifically, "[t]he FDNY will create an executive staff position of Chief Diversity and Inclusion Officer ('CDIO')."  (Id. ¶ 1(b)(i).)

---

[7]  The converse is not true; Hispanic claimants who received notice and an objection form relating to the MRCD did not also receive notice and an objection form regarding the Intent Stipulation, because they are not members of Plaintiff-Intervenors' class.

[8]  Citations to "Hr'g Tr." refer to the transcript of the October 1, 2014, Fairness Hearing.  Citations to "Supp. Hr'g Tr." refer to the transcript of the February 20, 2015, Supplemental Fairness Hearing.

The CDIO will report directly to the Fire Commissioner, and will be responsible for "promoting diversity in the FDNY and expanding awareness of the value of full inclusion of firefighters from all racial and ethnic groups." (Id.)

Additionally, "[t]he Fire Commissioner and CDIO will appoint a full-time Diversity Advocate from the uniformed force," who will "be responsible for raising concerns relating to fairness, transparency and respect for firefighter candidates during the hiring process and during probationary firefighter school." (Id. ¶ 1(b)(ii).) The Diversity Advocate will "have offices at FDNY headquarters and the Fire Academy"; "identify issues of concern to the appropriate officials and departments within the FDNY"; and "have meetings no less than quarterly with the Fire Commissioner to bring to his/her attention the concerns of and conditions affecting applicants and probationary firefighters from underrepresented groups." (Id. ¶ 1(b)(iii).)

### 3. Candidate Medical Screening

"The City will provide firefighter candidates complete information . . . regarding the components of the medical exam and standards that must be met to pass each component of the medical exam," and "candidates will be able to view their heart rates on the stairmill test while the test is being administered." (Id. ¶ 1(c).)

### 4. Fire Company Assignments

New York City residents who graduate from the Fire Academy will have "first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs." (Id. ¶ 1(d).)

### 5. Opportunities for New York City High School and College Students

The City agrees to "engage with the New York City Department of Education, colleges in New York City, including the CUNY [City University of New York] system, and other city

agencies to create educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters. This may include, among other things, the creation of a Fire Cadet title or special credit for completion of job-related fire science courses." (Id. ¶ 1(e).) The parties have submitted initials proposals for implementation of this initiative to the Court Monitor. (See id.)

6.       Court Monitor and Court Jurisdiction

The Intent Stipulation provides that it shall be administered and enforced by the court and the Court Monitor, and the authority of the court and Court Monitor as set forth in the Modified Remedial Order is expanded to encompass such administration and enforcement. (Id. ¶ 4.) The court "shall retain jurisdiction over the Parties to enforce and administer" the terms of the Intent Stipulation "for the same period and under the same conditions as set forth in the Modified Remedial Order." (Id. ¶ 15.)

7.       Attorneys' Fees

The amount of attorneys' fees payable to counsel for Plaintiff-Intervenors is not stipulated to in the settlement agreement. The agreement instead provides that Plaintiff-Intervenors and the City will negotiate in good faith regarding a payment of attorneys' fees upon the submission of an interim fee application by Plaintiff-Intervenors; if the parties are unable to agree, the dispute will be submitted to the court for resolution. (Id. ¶ 14.)

**C.     Notice**

In May 2012, the City sent notice and claim forms to all black and Hispanic individuals who had taken the two discriminatory exams; approximately 5,000 individuals submitted claim forms seeking individual relief. (See, e.g., Mem. in Supp. of Joint Mot. for Provisional Entry of MRCD & Scheduling of Fairness Hr'g (Dkt. 1434) at 6.) In a series of subsequent opinions

culminating in the Final Relief Order, the court set the final parameters for determining which of these individuals were victims of the City's discriminatory practices and therefore eligible for individual relief. In August 2013, the court concluded the last of its eligibility determinations, and ultimately ruled that 1,470 black and Hispanic claimants had been harmed by the discriminatory use of the exams. (See Feb. 22, 2013, Mem. & Order (Dkt. 1059); May 2, 2013, Mem. & Order (Dkt. 1106); May 9, 2013, Mem. & Order (Dkt. 1112); June 3, 2013, Mem. & Order (Dkt. 1135); June 7, 2013, Mem. & Order (Dkt. 1144); Aug. 9, 2013, Mem. & Order (Dkt. 1182); Aug. 9, 2013, Order (Dkt. 1184); Aug. 19, 2013, Order (Dkt. 1190); Sept. 3, 2013, Order (Dkt. 1195); Sept. 11, 2013, Order (Dkt. 1201); Nov. 18, 2013, Order (Dkt. 1236); Dec. 11, 2013, Am. Mem. & Order (Dkt. 1251).)

The United States brought its disparate impact claims on behalf of black and Hispanic firefighters harmed by the discriminatory use of the exams; Plaintiff-Intervenors brought their disparate treatment claims only on behalf of black firefighters. Accordingly, the members of Plaintiff-Intervenors' class—those who are bound by the Intent Stipulation, and who therefore required notice and an opportunity to object thereto—are that subset of the 1,470 eligible claimants who identify as black.

When the court preliminarily approved the Intent Stipulation, it provided that the date of a fairness hearing would be later determined, at which point a notice plan would also be ordered. (Apr. 23, 2014, Order.) During a May 7, 2014, status conference with the parties, the court directed that the fairness hearings for both settlement agreements (the Intent Stipulation and the MRCD) would be consolidated, and held on October 1, 2014. (May 7, 2014, Status Conf. Tr. at 15.) Notice of both settlement agreements, and the consolidated Fairness Hearing, was provided to all 1,470 eligible claimants in a coordinated fashion, in accordance with the court's

direction.  (See Apr. 29, 2014, Scheduling Order; see also May 2, 2014, Ltr. (Dkt. 1316) (proposing notice plan); Attach. to May 2, 2014, Ltr. (Dkt. 1316-1); May 7, 2014, Status Conf. Tr. at 15 (discussing consolidated Fairness Hearing and Plaintiff-Intervenors' May 2, 2014, submissions); id. at 28.)

After the court held the October 1, 2014, Fairness Hearing, it came to the court's attention in reviewing the parties' submissions and related record materials that 23 members of Plaintiff-Intervenors' class had not received proper notice of the Intent Stipulation and the Fairness Hearing.[9]  In accordance with the court's instruction (see Nov. 13, 2014, Order), Plaintiff-Intervenors and the City submitted a proposal regarding the provision of notice of the Intent Stipulation and of a supplemental fairness hearing to those individuals.  (Dec. 1, 2014, Ltr.)  The court approved the proposal submitted by the parties and scheduled the supplemental fairness hearing for February 20, 2015.  (Dec. 10, 2014, Order.)  Pursuant to that Order, notice of the disparate treatment settlement, the Intent Stipulation, and the Supplemental Fairness Hearing was provided to the 23 remaining members of Plaintiff-Intervenors' class, along with an objection form.

In sum, the notice provided now comports with Rule 23's requirements for the settlement of class claims.  See Fed. R. Civ. P. 23(e)(1); see also Fed. R. Civ. P. 23(e)(5).

---

[9]  A detailed notice plan specific to the Intent Stipulation (as opposed to one specific to the MRCD) had not been explicitly approved prior to the provision of notice.  And importantly, although notice of the MRCD had been provided to all members of Plaintiff-Intervenors' class—because they were also represented by the United States in connection with the disparate impact claims—notice of the settlement of the disparate treatment claims, the preliminarily-approved Intent Stipulation, and an objection form were not provided to those members of Plaintiff-Intervenors' Injunctive Relief Subclass, a Rule 23(b)(2) mandatory class, who had opted out of Plaintiff-Intervenors' Rule 23(b)(3) Non-Hire or Delayed-Hire Victim Subclasses.  (See Attach. to May 2, 2014, Ltr. ¶ 2(a).)  As the court explained in its various orders regarding class certification, the relevant subclass for the purpose of both injunctive relief and liability is a mandatory class.  (See, e.g., First Remedial Certification Order (Dkt. 640); Second Remedial Certification Order (Dkt. 665); see also Liability Certification Order (Dkt. 281).)  As clearly stated in the class notice and opt-out forms approved by the court in 2012, class members could not opt out of the Injunctive Relief Subclass.  (See Not. of Class Action (Dkt. 862-1) at ECF page 3; Apr. 20, 2012, Order.)  Additionally, all parties agree that any "prospective relief . . . —including monitoring, compliance, and affirmative relief to prevent future discrimination—should be resolved on a class-wide basis."  (First Remedial Certification Order at 29-30.)

## II. LEGAL STANDARD

Because the Intent Stipulation resolves the claims of a certified class, it may be approved only if it meets the standards set by Federal Rule of Civil Procedure 23(e).[10] See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."). Accordingly, the court may approve the Intent Stipulation only "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The court should consider any objections raised to the agreement by class members. See Fed. R. Civ. P. 23(e)(5).[11]

Additionally, courts have held that the proper standard for approval of a consent decree resolving a Title VII pattern or practice action assesses whether the proposed agreement is lawful, fair, reasonable, adequate, consistent with the public interest, and not the product of collusion, and whether any of the objections thereto has sufficient merit to overcome the presumption of validity accorded to the relief agreement; this standard has been applied to Rule 23 settlements as well as to Title VII actions brought by the United States as plaintiff. See, e.g., United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999); United States v. N.Y.C.

---

[10] Plaintiff-Intervenors' motions for final approval invoke section 703(n) of Title VII, 42 U.S.C. § 2000e-2(n), as providing the framework for the court's review of the settlement agreement. (See Mem. in Supp. of Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims & in Resp. to Objections (Dkt. 1471) at 3; Mem. in Supp. of Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims & in Resp. to Supp. Objection (Dkt. 1552) at 3.) This provision is inapt. Section 703(n) establishes a bar to collateral attack of any employment practice that implements, and is within the scope of, a litigated or consent judgment or order resolving an employment discrimination claim, by any person who had actual notice of the proposed order and a reasonable opportunity to present objections. 42 U.S.C. § 2000e-2(n)(1)(A)-(B). Notably, however, the section specifically does not apply to "parties to the action in which a litigated or consent judgment or order was entered, or . . . members of a class represented or sought to be represented in such action." Id. § 2000e-2(n)(2). In other words, it was enacted to "create[] a way by which litigants to a Title VII suit can bind nonparties who might otherwise stay on the sidelines [of the lawsuit]." Briscoe v. City of New Haven, 654 F.3d 200, 204 (2d Cir. 2011) (emphasis added). Because class members are the only persons who have received notice of the Intent Stipulation, and an opportunity to object thereto, it does not make sense to invoke this provision here.

[11] Additionally, the court must ensure that notice of the proposed settlement was directed "in a reasonable manner to all class members who would be bound by the proposal." See Fed. R. Civ. P. 23(e)(1). As explained above, see supra Part I.C, the notice provided satisfies this requirement.

Bd. of Educ., 85 F. Supp. 2d 130, 136, 151-54, 157 (E.D.N.Y. 2000), vacated on other grounds by Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123 (2d Cir. 2001); United States v. New Jersey, Nos. 88-CV-5087 (WGB), 88-CV-4080 (MTB), 87-CV-2331 (HAA), 1995 WL 1943013, at *10-12 (D.N.J. Mar. 13, 1995); Vulcan Soc'y of N.Y.C. Fire Dep't, Inc. v. City of New York, 96 F.R.D. 626, 629 (S.D.N.Y. 1983) (the court's role in approving the settlement is to "find that the terms of the settlement are lawful, reasonable and equitable, . . . that the interests of the class members are adequately served, and that the settlement does not unduly burden the rights and interests of other parties likely to be affected by its terms"); see also Vulcan Soc'y of Westchester Cnty., Inc. v. Fire Dep't of White Plains, 505 F. Supp. 955, 961-62 (S.D.N.Y. 1981) (in consolidated Title VII cases involving class action and lawsuit brought by the United States, requiring consent judgments to be "lawful, reasonable, and equitable . . . to all affected parties," and in the public interest). The court may need to place greater importance on the adequacy of the proposed settlement here, in the Rule 23 context, than would be appropriate were it considering a consent decree in a Title VII action brought solely by the United States. See SEC v. Citigroup Global Mkts., Inc., 752 F.3d 285, 294 (2d Cir. 2014) (in securities fraud enforcement action, distinguishing Rule 23(e) class action settlements from proposed consent judgment involving federal enforcement agency, and noting that whereas "a class action settlement typically precludes future claims, and a court is rightly concerned that the settlement achieved be adequate[,] . . . a consent decree does not pose the same concerns regarding adequacy—if there are potential plaintiffs with a private right of action, those plaintiffs are free to bring their own actions").

The court must be persuaded that the settlement is both substantively and procedurally fair. McReynolds v. Richards-Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009). As to procedural

fairness, the Second Circuit has directed the district court to "pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the necessary experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." Id. at 804 (alteration and internal quotation marks omitted).

With respect to substantive fairness, the Second Circuit has held that the "probability of plaintiffs' success on the merits and the range of possible relief are factors that courts have considered important in determining whether a Title VII class action settlement agreement should be approved." Kirkland v. N.Y. State Dep't of Corr. Servs., 711 F.2d 1117, 1129 (2d Cir. 1983) (citing cases); see also Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981) (in determining a consent decree's substantive fairness, courts should "weigh[] the plaintiff's likelihood of success on the merits against the amount and form of relief offered in the settlement"). Additionally, "when such a settlement implements race-conscious remedies, these factors can be encompassed by two central inquiries: (1) whether there is an existing condition which can serve as a proper basis for the creation of race-conscious remedies; and (2) whether the specific remedies of the compromise agreement are neither unreasonable nor unlawful." Kirkland, 711 F.2d at 1129.

Courts in this Circuit also frequently look to the Grinnell factors in assessing the substantive fairness of proposed class action settlements, and the Second Circuit has endorsed the propriety of consideration of those factors in class actions alleging employment discrimination. See Plummer v. Chem. Bank, 668 F.2d 654, 659 (2d Cir. 1982); see also United States v. N.Y.C. Bd. of Educ., 85 F. Supp. 2d at 145 (discussing Grinnell factors). The Grinnell factors include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction

of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in the light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 495 F.2d 448 (2d Cir. 2000).

Ultimately, although the court has considerable discretion in determining whether to approve a settlement, see Grinnell, 495 F.2d at 454, it must bear in mind that "voluntary compromises of Title VII actions enjoy a presumption of validity" and should be approved "unless . . . [they] contain[] provisions that are unreasonable, unlawful, or against public policy." Kirkland, 711 F.2d at 1128-29 (internal quotation marks and citation omitted).  In Kirkland, the Second Circuit approved of a district court's analysis of a Title VII class settlement agreement where the district court reviewed objections and ultimately asked whether the proposed remedies: (1) were "substantially related to the objective of eliminating the alleged instance of discrimination," and (2) did not "unnecessarily trammel the interests of affected third parties." 711 F.2d at 1132.  The court applied this standard in issuing the Final Relief Order (see Mem. & Order Addressing Objections to Proposed Relief Order at 6),[12] and will do the same here.

---

[12]  In connection with the Final Relief Order, the court was dealing with objections pursuant to section 703(n) of Title VII.  Here, although section 703(n) is not relevant, see supra note 10, it is still appropriate that the court ensure that affected third parties are treated fairly, particularly because third parties have not been given an opportunity to voice objections to the Intent Stipulation.

**III.    DISCUSSION**

    **A.    Fairness and Adequacy of the Intent Stipulation**

        1.    <u>Procedural Fairness</u>

The court already found, as a preliminary matter, that the proposed settlement was "'the product of serious, informed, non-collusive negotiations,' and include[d] no obvious deficiencies or preferential treatment for any segments of the class." (Apr. 23, 2014, Order at 2 (quoting <u>In re Initial Pub. Offering Sec. Litig</u>, 243 F.R.D. 79, 87 (S.D.N.Y. 2007), <u>adhered to on reconsideration</u>, No. 21-MC-92 (SAS), 2007 WL 844710 (S.D.N.Y. Mar. 20, 2007)).)  Indeed, Plaintiff-Intervenors have vigorously prosecuted this case on behalf of class members over the course of nearly a decade, and the court has no reason to doubt the procedural propriety of this settlement agreement.

        2.    <u>Substantive Fairness</u>

As noted above, the standard for assessing the substantive fairness of a class settlement agreement generally weighs the amount and form of relief provided by the settlement, the amount and form of relief available upon success on the merits, and the plaintiffs' likelihood of success on the merits.  <u>See</u> <u>Carson</u>, 450 U.S. at 88 n.14; <u>Kirkland</u>, 711 F.2d at 1129.  Many of the <u>Grinnell</u> factors also speak to such a balancing approach.  The posture of the case, however, makes application of the factors a bit unusual here.  In connection with their disparate impact claims, Plaintiff-Intervenors are already entitled to individual compensatory, "make whole" relief, damages for certain noneconomic harms, and the injunctive compliance relief contained in the Modified Remedial Order.  Accordingly, class members are already receiving compliance and compensatory relief, which constitute the majority of the relief that would be available if they were to prevail after trial on their disparate treatment claims.  (<u>See</u> Final Relief Order at 4-5

(discussing three forms of Title VII relief: compliance relief, compensatory relief, and affirmative relief).) See also Berkman v. City of New York, 705 F.2d 584, 594-95 (2d Cir. 1983) (holding that compliance and compensatory relief are appropriate "whenever a Title VII violation has been found"). The provisions of the Intent Stipulation complement the relief awarded in connection with the disparate impact claims, by providing additional relief, including certain relief that could be characterized as "affirmative"—a form of relief that is "designed principally to remedy the effects of discrimination that may not be cured by the granting of compliance or compensatory relief" and that is typically appropriate only in the case of intentional discrimination. Berkman, 705 F.2d at 596; see also id. ("Affirmative relief . . . may include . . . the imposition of a requirement that the defendant actively recruit or train members of the Title VII-protected group.").

The Intent Stipulation includes certain provisions that are appropriately characterized as affirmative relief, and which constitute much of any additional relief (on top of the compensatory and compliance relief they are already receiving) to which Plaintiff-Intervenors might be entitled if they were to prevail on their intentional discrimination claims after trial. Meanwhile, in light of the Second Circuit's opinion reversing this court's granting of summary judgment with respect to Plaintiff-Intervenors' disparate treatment claims, Plaintiff-Intervenors' likelihood of success on the merits is unclear at this stage in the proceedings. Accordingly, as far as the court is able to apply the Carson-Kirkland-Grinnell balancing approach to the terms of the Intent Stipulation, it passes that test. Additionally, Grinnell factor (2)—the reaction of the class to the settlement—weighs heavily in favor of approval. Out of approximately 755 class members,[13]

---

[13] See Am. Decl. of Ed Barrero (Dkt. 1468-2), Ex. A (table indicating number of eligible claimants in each damages category).

18

only 21 objections were filed—and even this number overstates the number of actual objections by class members.  In substance, only 3 class members objected to the Intent Stipulation.[14]

Additionally, race-conscious remedies are appropriate here where Plaintiff-Intervenors have indisputably made out their prima facie case, see United States v. City of New York, 717 F.3d at 88, and there has been a very long history of discrimination, see, e.g., Vulcan Soc'y of N.Y.C. Fire Dep't, Inc. v. Civil Serv. Comm'n, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973) (finding, in 1973, that the City's written and physical examinations for entry-level firefighters violated the Equal Protection Clause because of their discriminatory impact on black and Hispanic applicants), aff'd in relevant part, 490 F.2d 387 (2d Cir. 1973).  See also Kirkland, 711 F.2d at 1130 ("[A] showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies."); Berkman, 705 F.2d at 596 (noting that "[a]ffirmative relief[,] . . . which may include . . . the imposition of a requirement that the defendant actively recruit . . . members of the Title VII-protected group," is appropriate where "there has been a long-continued pattern of egregious discrimination").  Plaintiff-Intervenors submit that the agreement should be approved because the specific relief provided is "substantially related to the objective of ending racial discrimination in the City's firefighter hiring practices and removing the effect of the City's long history of racial discrimination in firefighter hiring and does not unnecessarily trammel the interest[s] of affected third parties."  (Mem. in Supp. of Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims & in Resp. to Objections ("Mem. in Supp. of Final Entry of Intent Stipulation") (Dkt. 1471) at 8.)  See Kirkland, 711 F.2d at 1132 ("The

---

[14]  As explained below, 4 of these objections consisted of blank forms; 12 contained objections, in substance, to the AMRCD, not to the Intent Stipulation; and 2 were raised by Hispanic claimants, who are not members of Plaintiff-Intervenors' class.  Accordingly, in substance, a mere 3 class members objected to entry of the Intent Stipulation.

remedies provided by a Title VII settlement, especially those containing race-conscious relief, must be substantially related to the objective of eliminating the alleged instance of discrimination, and must not trammel the interests of affected third parties.").  The court agrees, and will discuss each of the provisions in turn below.

<em>a.      Recruitment</em>

The Intent Stipulation requires the City to use its "best efforts" to recruit black test-takers for entrance exams in proportions closely approximating the representation of age-eligible blacks in the New York City labor market plus an additional 3%.  (Intent Stipulation ¶ 1(a).)  Plaintiff-Intervernors explain that this provision recognizes the "continuing issue of attrition in the firefighter hiring process."  (Mem. in Supp. of Final Entry at 8.)  Plaintiff-Intervernors are correct that the court has previously recognized voluntary post- and pre-examination attrition to have disproportionately affected the rates of retention for black firefighter candidates.  (See, e.g., Oct. 5, 2011, Mem. & Order at 26-27; Modified Remedial Order at 11-12; Findings of Fact as to Injunctive Relief at 4-17; Mem. in Supp. of Final Entry at 8.)  Attrition—including pre-examination—continues to affect minority hiring; in connection with the 2012 administration of Exam 2000, black applicants had a higher rate of attrition than white applicants between the period of application and appearance for the written examination.  Specifically, 74% of white applicants who applied to take the examination appeared for the examination, whereas 64% of black applicants did the same.  (See Mem. in Supp. of Final Entry at 8-9; September 22, 2014, Decl. of Richard A. Levy in Supp. of Final Entry of Proposed Stipulation and Order ("First Levy Decl.") (Dkt. 1472), Ex. 21 (Dkt. 1472-21); Hr'g Tr. at 39:7-13.)

The disparate impact of attrition upon black firefighter candidates is due, at least in part, to the decades-long history of discrimination faced by black applicants to the FDNY.  See, e.g.,

Civil Serv. Comm'n, 360 F. Supp. at 1269 (exams found to have discriminatory impact upon black and Hispanic applicants to FDNY as early as 1973). Whereas "white firefighter candidates are significantly more likely to have friends or family members in the FDNY maintaining contact with them and encouraging them to persevere through the FDNY's . . . hiring process[,] . . . [b]lack firefighter candidates are significantly less likely to have similar informal support mechanisms available to them because of the City's history of using discriminatory testing procedures that systematically excluded black firefighter candidates from becoming firefighters." (Findings of Fact as to Injunctive Relief at 14-15.) Similarly, recruitment generally of black applicants to the FDNY suffers because it is less likely that any potential black applicant will have friends or family members in the FDNY. (See id. at 29-33 (discussing FDNY's "informal friends-and-family recruitment network").)

Accordingly, the recruitment provision of the Intent Stipulation is "substantially related to the objective of eliminating the alleged instance of discrimination," Kirkland, 711 F.2d at 1132, by seeking to ameliorate these two effects of the City's long history of using discriminatory exams—a disparate impact upon black applicants generally, and a disparate impact with respect to attrition of black applicants. Cf. Berkman, 705 F.2d at 596 ("[T]he imposition of a requirement that the defendant actively recruit or train members of the Title VII-protected group . . . may be required where, for example, the defendant has . . . egregiously engaged in a practice of discrimination that is likely to have discouraged members of the protected group from becoming members of the applicant pool at any stage."). Additionally, by setting a goal (not a quota) for recruitment (not for hiring), the provision does not impermissibly

"trammel the interests" of other minority or non-minority applicants, id.; black applicants are given no preference in hiring.[15]

b.     *Chief Diversity and Inclusion Officer*

The Intent Stipulation provides for a new executive FDNY position, the CDIO, who will report directly to the Fire Commissioner.  The CDIO will be responsible for "promoting diversity in the FDNY and expanding awareness of the value of full inclusion of firefighters from all racial and ethnic groups."  (Intent Stipulation ¶ 1(b)(i).)  Plaintiff-Intervenors envision that the CDIO will, inter alia, (1) oversee the FDNY's internal Equal Employment Opportunity ("EEO") Office, including identifying EEO resource and enforcement problems in order to improve the EEO system; (2) encourage enhanced recruiting of minority applicants; (3) encourage fairness in the hiring process; and (4) more generally work to "raise awareness, to make inclusivity part of the culture of the fire department."  (Hr'g Tr. at 40:10-41:5; Mem. in Supp. of Final Entry of Intent Stipulation at 10.)

The court explained above that enhanced minority recruitment is an appropriate remedy in this case; accordingly, efforts by a high-ranking FDNY official to encourage such enhanced recruitment would also be welcome.  The court has previously discussed deficiencies of the FDNY's EEO Office (e.g., Oct. 5, 2011, Mem. & Order at 19; Findings of Fact as to Injunctive Relief at 60-81), and required in the Modified Remedial Order that the City reassess the FDNY's EEO program in order to make substantial changes (see Modified Remedial Order at 15-18; Oct. 5, 2011, Mem. & Order at 26).  Any help in that process by an FDNY executive tasked with promoting diversity would also be welcome.  The goals of fairness in the hiring process and a

---

[15]  The court previously rejected Plaintiff-Intervenors' proposal that the court order a 60% minority hiring requirement (3 black and 3 Hispanic applicants out of every 10 selections), holding that such a quota would "place a sizable burden upon the non-minority applicants."  (Initial Remedial Order at 36-41.)  The court suggested in doing so that "enhanced measures to notify and recruit interested minority candidates" would likely be more appropriate. (Id. at 40.)  The measure included in the Intent Stipulation is an appropriate one.

culture of inclusivity are certainly directed at remedying the specific past harm in this case, as well as its effects.

The CDIO's mission is to promote full inclusion of firefighters "from all racial and ethnic groups." (Intent Stipulation ¶ 1(b)(i); see Hr'g Tr. at 41:5-7; Mem. in Supp. of Final Entry of Intent Stipulation at 10.) Accordingly, this provision does not unnecessarily "trammel the interests" of any third parties.

*c.     Diversity Advocate*

The second new appointment created by the Intent Stipulation is a full-time Diversity Advocate. (Intent Stipulation ¶ 1(b)(ii)-(iv).) The Diversity Advocate, a member of the uniformed force, will "be responsible for raising concerns relating to fairness, transparency and respect for firefighter candidates during the hiring process and during probationary firefighter school," including keeping the Fire Commissioner informed of "the concerns of and conditions affecting applicants and probationary firefighters from underrepresented groups." (Id. ¶ 1(b)(ii)-(iii).) Probationary firefighters and applicants will be able to bring concerns or problems they encounter to the Diversity Advocate in confidence, and the Diversity Advocate can in turn bring issues he or she learns about to the CDIO, EEO Office, Fire Commissioner, and Court Monitor if necessary. (See id. ¶ 1(b)(iii); Hr'g Tr. at 41:10-42:4; Mem. in Supp. of Final Entry of Intent Stipulation at 10.)

The Diversity Advocate position is an excellent idea. It is highly likely that at least some probationary firefighters and applicants who would not have otherwise raised concerns to the FDNY regarding their treatment will raise those concerns to the Diversity Advocate, because they may do so in confidence, and because the Diversity Advocate, as a member of the uniformed force, may seem more approachable. This, in turn, has the potential to have a number

of positive outcomes, including, inter alia: (1) reducing attrition of those applicants and firefighters at the hiring stage and during the Fire Academy by providing support for these individuals, and (2) monitoring for unfair treatment of priority hires and other applicants (see Oct. 26, 2012, Mem. & Order at 2, 17-18 (discussing concern that some FDNY personnel had indicated an unwillingness to welcome priority hires and other beneficiaries of the court's remedial orders into their ranks)), and thus putting FDNY leadership in a position in which they are able to address such treatment. Additionally, this appointment does not deprive third parties of any rights. Indeed, while the Diversity Advocate is specifically charged with advocating for applicants and probationary firefighters "from underrepresented groups in the FDNY" (already a much broader group than the black firefighter candidates who make up Plaintiff-Intervenors' class), any firefighter candidate of any race or ethnicity, man or woman, will be able to bring concerns regarding his or her treatment to the Diversity Advocate. (See Hr'g Tr. at 42:5-12.)

d.  *Candidate Medical Screening*

The next provision of the Intent Stipulation requires the City to provide increased information and transparency regarding the medical examination. (Intent Stipulation ¶ 1(c).) Post-examination attrition of black firefighter candidates includes attrition at the medical examination stage of the hiring process. (See Hr'g Tr. at 42:18-20.)

One complaint that minority applicants have frequently made regarding the medical examination is "that they didn't understand why they were excluded, they didn't understand what the standards were," and/or "they didn't . . . know that they could actually retake an exam or go outside for additional medical help and not lose their place entirely." (Hr'g Tr. at 42:21-43:2.) This lack of knowledge on the part of minority applicants can be attributed, at least in part, to it being less likely that these applicants have friends or family members who have successfully

gone through the firefighter hiring process and who can provide otherwise undisclosed information.  See supra Part III.A.2.a.  (See also Hr'g Tr. at 43:5-9.)  The Intent Stipulation seeks to remedy this information problem by requiring the City to prepare a summary of the medical examination process to be included in applicants' intake packets, providing complete information regarding the components of the exam and the standards that must be met, which should in turn help candidates prepare for the examination in a manner that maximizes all candidates' chances of success.  (Hr'g Tr. at 43:3-11; Intent Stipulation ¶ 1(c); see also Ct. Monitor's Eleventh Periodic Report at 16 (discussing process of finalizing guidance document).)

In addition to the guidance document, the Intent Stipulation provides certain additional information to firefighter applicants, insofar as candidates will be able to view their heart rates while the stairmill test is being administered.  (Intent Stipulation ¶ 1(c).)  Plaintiff-Intervenors and the United States contend that the medical examination itself—including the stairmill test—has had a disparate impact on both black and Hispanic candidates.[16]  (See Ct. Monitor's Ninth Periodic Report (Dkt. 1462) at 4-5; Ct. Monitor's Tenth Periodic Report at 13-14; Ct. Monitor's Eleventh Periodic Report at 13-15.)  Allowing candidates to view their results while taking the test may help in some way to remedy this issue—either by providing these candidates the opportunity to adjust their approach to the test while taking it, or at least by providing them with some information necessary to prepare for a second attempt.

This relief is sufficiently targeted to remedy the effects of the City's past discrimination, and it does not negatively affect the rights of non-class members—the information will be provided to all applicants to the FDNY, not only to minority applicants.  (See Hr'g Tr. at 43:9-11; Mem. in Supp. of Final Entry of Intent Stipulation at 11.)

---

[16]  The Court Monitor is currently analyzing the medical examination and any possible disparate impact thereof, and has so far "isolated portions of the medical exam that may have meaningful levels of disparate impact on candidate groups."  (Ct. Monitor's Eleventh Periodic Report at 13-15.)

*e.    Fire Company Assignments*

Another provision of the settlement agreement gives first priority to New York City residents to be assigned (on a voluntary basis) to a fire company near their homes, "to the extent reasonable, practicable and consistent with operational needs."  (Intent Stipulation ¶ 1(d).)  This provision too applies to all probational firefighters, not only to black or Hispanic firefighters. (Hr'g Tr. at 44:4-7.)  Plaintiff-Intervenors explain that a primary purpose of this provision is to increase the chance that black or Hispanic children who live in predominantly black or Hispanic neighborhoods will see firefighters of color, and encourage those children to consider the FDNY as a viable career option.  (Mem. in Supp. of Final Entry at 5; Hr'g Tr. at 46:15-47:8.)  Because the percentage of minority firefighters is currently so low within the FDNY, as well as for other reasons that were discussed at reasonable length during the Fairness Hearing, there is little chance that this provision will result in disproportionately black or Hispanic firehouses—in other words, it is not likely to work against the objective of a more diversified force within particular firehouses.  (See Hr'g Tr. at 44:7-46:10.)  Additionally, the "standard of reasonableness . . . stands as a limit upon the development over time of racially-identifiable firehouses."  (Mem. in Supp. of Final Entry at 11.)

The court is convinced that this provision certainly could help recruitment efforts in minority neighborhoods by providing an environment in which the youth in those neighborhoods feel comfortable in the firehouse, remedying effects of the history of discrimination in this case. Additionally, because all firefighters—white, minority, male, and female—will have the equal opportunity to be placed near their homes, "so that they're not living at one end of Staten Island and being assigned to the North Bronx" (Hr'g Tr. at 46:14-15), this provision does not negatively impact third parties' rights.

f.    *Opportunities for New York City High School and College Students*

Pursuant to the final substantive provision of the Intent Stipulation, the City commits to "engage with the New York City Department of Education, colleges in New York City, including the CUNY system, and other city agencies to create educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters." (Intent Stipulation ¶ 1(e).) The settlement agreement contemplates that these opportunities might include, for example, "the creation of a Fire Cadet title or special credit for completion of job-related science courses." (Id. ¶ 1(e).)[17]

As Plaintiff-Intervenors note, this court has previously stated that "the Fire Cadet Program[] show[s] promise in increasing the representation of black and Hispanics in the FDNY." (Oct. 5, 2011, Mem. & Order at 21; see Hr'g Tr. at 47:22-48:1.) As a general matter, focusing efforts on students attending New York City Department of Education public high schools and CUNY colleges would likely have this result as well.

Accordingly, the court finds that this provision is appropriate and substantially related to remedying the effects of the past discrimination at issue in this case. Additionally, although the goal of this provision is to increase opportunities for black and Hispanic students to become firefighters, those opportunities will not be limited to black and Hispanic students. (See Mem. in Supp. of Final Entry of Intent Stipulation at 12.) Thus, this provision does not "trammel the

---

[17] The parties have formed a working group committee tasked with implementing this provision of the Intent Stipulation, which has now met several times. (See Ct. Monitor's Eleventh Periodic Report at 8.) The parties have agreed to pursue the establishment of a Fire Cadet title that would qualify for promotion to firefighter, likely upon passage of a promotional exam, and they are working to develop a proposal for submission to the necessary state agency in order to establish the title and its promotional eligibility. (Id.) The working group is considering additional high school initiatives, such as expanding existing FDNY high school programs, and developing additional recruitment and awareness initiatives in connection with the Department of Education. (Id. at 9.) Furthermore, the working group is coordinating with CUNY to develop college initiatives "to potentially build on existing fire science certificate programs and coursework that would be eligible for credit towards a degree or professional advancement." (Id.)

interests" of any affected third parties, <u>Kirkland</u>, 711 F.2d at 1132; non-minority New York City high school and college students may also take advantage of these opportunities.

**B.      Objections**

Twenty-one written objections were submitted.[18]  Four objectors submitted blank objection forms, stating no objection (Obj.-Exs. 1-4); twelve appeared to object not to the Intent Stipulation, but rather to the monetary relief settlement relating to the City's disparate impact liability (Obj.-Exs. 5-16); one stated that the Intent Stipulation was "confusing/vague/misleading/ ambiguous" (Obj.-Ex. 17); three stated that "City of New York and the New York City Fire Department continues a pattern and practice of discrimination against members of protected classes" (Obj.-Exs. 18-20);[19] and one objector reported only that he was "not ch[o]sen," was "a Non-Hire and a Delayed Hire," and "was also from California" (Obj.-Ex. 21).  After the Fairness Hearing, the court held the record open for fourteen days for additional written submissions in support of or opposed to the Intent Stipulation (or to the monetary relief settlement).  The court received a small number of additional objections to the monetary relief settlement, but did not receive any regarding the Intent Stipulation.  In connection with the provision of supplemental notice leading up to the Supplemental Fairness Hearing, the court received only a single written objection, which is included in the twenty-one objections discussed above (designated here as Objection-Exhibit 21).

---

[18]  These objections are filed as exhibits to the First Levy Declaration and to the February 10, 2015, Declaration of Richard A. Levy in Support of Final Entry of Proposed Stipulation and Order ("Second Levy Decl.") (Dkt. 1553). Twenty objections (<u>see</u> Dkts. 1472-1 through -20) were filed as exhibits to the First Levy Declaration; these will be referred to above as "Obj.-Ex. [1-20]."  One additional objection (<u>see</u> Dkt. 1553-1) was filed as an exhibit to the Second Levy Declaration; this objection will be referred to above as "Obj.-Ex. 21."

[19]  Two of these three objections were filed by Hispanic claimants—claimants who are not members of the Plaintiff-Intervenors' class and who therefore are not bound by the Intent Stipulation.  (<u>See</u> Obj.-Exs. 19-20 (objection forms submitted by claimants 200001690 and 200006013).)  As non-class members, these two claimants did not receive official notice of the Intent Stipulation, but they submitted objections nonetheless via attorney affidavit.

The court also heard oral objections at the Fairness Hearing.  The majority of the oral objections were directed to the issue of monetary relief and therefore not relevant to the assessment of the Intent Stipulation.  Although given the opportunity to do so, no class member presented any objection to the Intent Stipulation at the Supplemental Fairness Hearing.  Below, the court will discuss all written and oral objections lodged to the Intent Stipulation.  In sum, none of the objections provides grounds for the court to deny final approval and entry of the Intent Stipulation, and they are all overruled.

### 1.    No Objection Stated

Four class members submitted objection forms that were blank, aside from providing the objectors' names, addresses, and telephone numbers.  (See Obj.-Exs. 1-4.)  The court cannot assess the grounds or substance of these claimants' objections; therefore, these blank forms provide the court with no basis for denying final approval and entry of the Intent Stipulation.[20]

### 2.    Objections to Monetary Relief Settlement

Twelve of the submissions that used the form intended for objection to the Intent Stipulation appear, in substance, to contain objections not to the Intent Stipulation, but rather to the amount or allocation of individual monetary awards as set forth in the individual monetary relief settlement—which relates to the "make whole" individual relief necessary to remedy the City's disparate impact liability, and which the court has separately assessed and approved.  (See Obj.-Exs. 5-16; see also Mar. 11, 2015, Mem. & Order (approving AMRCD).)  These objections argue, for example, that the "monetary relief that they are offering individually is not enough" (Obj.-Ex. 7), that the proposed award "did not take into account the hardship of many lost time doing overtime to compens[]ate the wage as a firefighter" (Obj.-Ex. 11), or that "everyone

---

[20]  It is not clear that each of these claimants intended to oppose final entry of the Intent Stipulation; one of the forms includes a large "N/A" across the portion of the form that the class member was meant to fill out.  (Obj.-Ex. 1.)

should [have] been pa[id] out even according[ ] to the year we took the exam. It shouldn't go by the past income of what we had earned" (Obj.-Ex. 5). The Intent Stipulation, which deals only with injunctive relief in order to resolve Plaintiff-Intervenors' intentional discrimination claims, is separate and apart from the individual "make whole" relief to which eligible claimants were already entitled, pursuant to the court's summary judgment ruling as to disparate impact liability and its Final Relief Order, and settlement of which was at issue in the monetary relief settlement. Accordingly, these objections do not address the merits of the Intent Stipulation, and they provide no basis for the court to deny final approval and entry thereof. The merits of these objections as they related to the individual monetary relief settlement were considered and discussed (and overruled) in the court's March 11, 2015, Memorandum and Order.

### 3. Confusing/Vague/Misleading/Ambiguous

One class member submitted an objection form on which he wrote: "Confusing/vague/misleading/ambiguous." (Obj.-Ex. 17.) The form does not elaborate, or explain what this objector believes to be vague or confusing about the Intent Stipulation. Nor did this claimant appear at the Fairness Hearing or Supplemental Fairness Hearing so that the court could inquire further. Nonetheless, the court has carefully reviewed the Intent Stipulation and does not find it to be confusing, vague, misleading, or ambiguous. This objection is therefore overruled.

### 4. Continuing Pattern and Practice of Discrimination

Three claimants represented by common counsel submitted identical objections (Obj.-Exs. 18-20), each of which stated that "upon information and belief . . . the City of New York and the New York City Fire Department continues a pattern and practice of discrimination against members of protected classes." (E.g., Obj.-Ex. 18 ¶ 2 (capitalization removed).)

The written objections did not explain how these claimants contended that the FDNY continues a pattern and practice of discrimination against members of protected classes. The Intent Stipulation resolves a narrow claim—Plaintiff-Intervenors' and class members' claims that the FDNY intentionally discriminated against black firefighter applicants by its pass-fail and rank-order use of Written Exams 7029 and 2043. Final entry of the Intent Stipulation would not preclude a pattern and practice claim based on any other FDNY employment practice—for example, intentional discrimination in post-examination screening, or in a practice unrelated to hiring. Final entry would also preclude neither a pattern and practice claim based on any protected characteristic other than black race or ethnicity, nor one brought by a non-class member. Any objections related to alleged discriminatory practices that do not fall within the Plaintiff-Intervenors' claims fall without the scope of the Intent Stipulation and provide no grounds for denying final entry.

At the Fairness Hearing, counsel for these three claimants elaborated on their objections. Counsel spoke about specific problems that each has had with the FDNY.

- *Henry Bresilien (Claimant 20000219)*

Henry Bresilien was appointed to the FDNY as a priority hire. He was injured in the Fire Academy, and he now sits at a desk at FDNY headquarters. At the Fairness Hearing, Bresilien's counsel stated that he sought to present evidence that the FDNY hires drill instructors for the Fire Academy with the purpose of making it "so difficult as to dissuade people from continuing to forcing people to retire." (Hr'g Tr. at 73:6-7.) He also stated that Bresilien "was referred to in many inappropriate ways at the [A]cademy . . . including, but not limited to, individuals within a capacity of authority saying when are you going to quit, old man?" (Id. at 73:8-11.) He argued that although Bresilien was injured, he was "able-bodied," and that "[i]f the fire department

31

really wanted to continue into the future, he could be doing recruitment, . . . hydrant inspection, . . . [or] building inspection now." (Id. at 73:18-22.) He argued that the settlement was therefore not fair in regard to Bresilien. (Id. at 73:24-25.) He further insisted that the settlement "will not carry into the future in its present state." (Id. at 73:15-16.)

Bresilien was held eligible for relief in this case in connection with Exam 7029; his presumptive hire date is February 2003. (Jan. 22, 2013, R&R of Special Master Cohen (Dkt. 1044-1); Feb. 22, 2013, Mem. & Order; May 2, 2013, Mem. & Order.) If, in the absence of discrimination, Bresilien had been appointed in 2003, he would have been approximately ten years younger upon entry to the Fire Academy than he was when actually appointed as a priority hire. To the extent that Bresilien's frustration with the priority hire process and the Fire Academy stems from that age difference, that does not come within the scope of the Intent Stipulation, and it does not provide the court a reason to deny it final approval. The court's prior orders are directed at attempting to remove the individual effects of the City's past disparate impact discrimination, including by directing priority hiring relief to eligible claimants, including Bresilien. The priority hiring process is not perfect, and one of the main problems with that process has been the passage of time since the tests were taken, during which priority hire candidates have all aged. For example, some of those candidates have been unable to pass physical or medical tests at their appointment date that they may have passed had they been hired at their presumptive hire date. That passage of time is an unfortunate result of the vast amount of time that this litigation has taken, but it does not constitute a reason to invalidate this settlement agreement, which is independent of the court's prior rulings that created the priority hiring process.[21]

---

[21] Indeed, the Intent Stipulation includes two provisions that may assist priority hire candidates in passing the medical screening tests; it ensures that candidates will be given complete information regarding the medical exam

To the extent that Bresilien is suggesting that his experience at the Fire Academy was negative because of a culture at the FDNY that is unwelcoming to priority hires or to minority firefighters more generally, or that such a culture continues to negatively affect the way he is treated in his employment, that is disappointing and discouraging; however, it is not a reason to withhold approval of the Intent Stipulation. To the contrary, it is a reason to approve the agreement. A number of the agreement's provisions are specifically intended to improve the culture of the FDNY with respect to racial diversity and inclusion; for example, it provides for a Diversity Advocate who is specifically empowered to monitor for and raise any concerns to the Fire Commissioner (and to the Court Monitor) regarding issues of fairness and respect for priority hires and other minority applicants and probationary firefighters, including any issues that arise at the Fire Academy. (Intent Stipulation ¶ 1(b)(i)-(iv)). See supra Part III.A.2.c. Other provisions, including the "best efforts" provision regarding recruitment of black firefighter candidates (id. ¶ 1(a)), are intended, in time, to lead to a more representative uniformed force; it is hoped that as the number of minority firefighters increases, the culture will change as well. The court remains optimistic that the implementation of the Intent Stipulation, together with that of the Modified Remedial Order, as well as the oversight of both by the court and the Court Monitor, will lead to a uniformed force that is more diverse, and one that is welcoming to firefighters and firefighter candidates of all races and ethnicities. Bresilien's objection is overruled.

- *Arnaldo Rodriguez (Claimant 20001690)*

Arnaldo Rodriguez, who is a Hispanic claimant, is also a priority hire. He was promoted to firefighter from EMT. (Hr'g Tr. at 77:4-6.) Rodriguez attended the Fire Academy for

_____

components and standards, and that candidates will be able to view their heart rates during the administration of the stairmill test. (Intent Stipulation ¶ 1(c).)

approximately four days, and then he was removed from the Academy for a medical issue, possibly due to a concussion that he had suffered as an EMT. (Id. at 78:2-19.) After his removal from the Academy, Rodriguez continued to be compensated as a firefighter for an extended period of time; he then began to be compensated again as an EMT, although he has received no documentation of demotion back to EMT status. (Id. at 78:2-8.)

Rodriguez's counsel argued that the Intent Stipulation was inequitable and unfair to Rodriguez because "a global settlement is supposed to correct an injustice in the past and into the future start from a level playing field," and he "[did]n't see that with regards to [his] client[]." (Id. at 79:1-4.) For example, if Rodriguez had "been hired years ago, he would have had promotional opportunities if he was a firefighter years ago, not an EMT." (Id. at 80:6-7.)

Rodriguez's complaints—regarding both the confusion over his pay rate and the loss of promotional opportunities—do not bear on the court's assessment of the Intent Stipulation. As an initial matter, the Intent Stipulation is not intended to be a "global settlement." Instead, as the court explained at the Fairness Hearing, the Intent Stipulation is only one small piece of the overall disposition of this litigation. For example, Rodriguez's complaint regarding the loss of promotional opportunities bears on the appropriate form and amount of "make whole" individual relief, which flows from the City's disparate impact liability, and which is addressed in the Final Relief Order and ultimately has been resolved with the court's approval of the AMRCD—it is outside the scope of the Intent Stipulation. Nor does Rodriguez's complaint regarding the change in his pay rate after his removal from the Fire Academy appear to have any obvious relation to Plaintiff-Intervenors' claims of intentional discrimination based on the pass-fail and rank-order use of Written Exams 7029 and 2043—the only matters resolved by the Intent Stipulation.

Finally, Rodriguez is not a member of Plaintiff-Intervenors' class; he is a Hispanic non-hire claimant.  (See Mem. in Supp. of Final Entry of Intent Stipulation at 7; Hispanic Eligible Priority Hire List (Dkt. 1147) at 3.)  Because Rodriguez is not a member of the class, final approval and entry of the Intent Stipulation would not preclude him from bringing a separate claim for any continuing pattern or practice of intentional discrimination by the FDNY, or from participating as a class member in such an action.  Rodriguez does not argue that anything contained in the Intent Stipulation would harm his interests as a non-class member, or the interests of other non-class members.  Therefore, Rodriguez's objection is overruled.

- *Rolando Romero (Claimant 20006013)*

Rolando Romero, another Hispanic claimant, is a delayed-hire.  Romero's counsel stated that after Romero had been an FDNY firefighter for approximately ten years, his firehouse "became so hostile towards the notion of this Court's ruling that they took it out on Mr. Romero without even knowing that Mr. Romero had attached himself somehow to this litigation."  (Hr'g Tr. at 82:14-19.)  Eventually, a co-worker taunted Romero, stating: "Punch me in the face so we can get rid of you."  (Id. at 82:22.)  Romero was removed from his firehouse, and was sent to a series of different work locations; after a period of time, he went through retraining, and was seriously burned in a training accident.  (Id. at 82:22-83:7.)  Romero contends that he was intentionally burned—that the training exercise was set up such that it was impossible to execute unless he crawled through fire (which he did).  (Id. at 84:7-10, 85:5-16.)

Subsequently, Romero was terminated "essentially for going out and getting a cup of coffee while he was assigned to FDNY headquarters."  (Id. at 83:19-20.)

As the court explained at the Fairness Hearing, Romero's issue regarding his employment status, and his claim of intentional burning—which he is pursuing in a separate tort action

against the City, represented by counsel—are outside the scope of what the Intent Stipulation is seeking to accomplish and resolve.  (See id. at 84:7-10, 84:17-85:1, 85:23-86:6.)  To the extent that Romero was treated poorly by certain co-workers on the basis of his race and/or status in this litigation, provisions of the Intent Stipulation are intended to, and have the potential to, create a more inclusive and diverse environment within the uniformed ranks; as explained above, this counsels in favor of approving the Intent Stipulation.

Additionally, Romero, like Rodriguez, is not a member of Plaintiff-Intervenors' class. (See Mem. in Supp. of Final Entry of Intent Stipulation at 7.)  Accordingly, final entry of the Intent Stipulation would not preclude him from bringing a separate claim for any continuing pattern or practice of intentional discrimination by the FDNY, or from participating as a class member in such an action.  Romero does not argue that anything contained in the Intent Stipulation would harm his interests as a non-class member, or the interests of other non-class members.  Therefore, Romero's objection is overruled.

5.    Failure To Be Hired

One class member submitted an objection form stating: "I was not ch[o]sen.  I was a Non-Hire and a Delayed Hire.  I was also from California." (Obj.-Ex. 21.)  The objection is somewhat cryptic, as this claimant was found eligible for monetary and priority hiring relief as a non-hire claimant (and not as a delayed-hire claimant).  (See Jan. 22, 2013, R&R of Special Master Gonzalez (Dkt. 1044-3) at 8 (claimant 200000834); Feb. 22, 2013, Mem. & Order; May 2, 2013, Mem. & Order.)  It is also unclear what being from California has to do with this claimant's objection.  The court construes this submission to object generally on the basis that the claimant was discriminated against in his failure to be hired by the City.  This does not provide grounds for the court to deny final approval and entry of the Intent Stipulation; the fact

that many black and Hispanic individuals were not hired (or were delayed in their hiring) is the very starting point for this litigation and for the settlement agreement currently under consideration, which seeks to remedy the situation by, inter alia, forging a more inclusive and diverse FDNY going forward.

6.     Miscellaneous Statements Made at Fairness Hearing

Finally, two class members who spoke at the Fairness Hearing made comments in raising objections to the monetary relief settlement that only bolster the court's decision to approve the Intent Stipulation.

One class member spoke positively about certain provisions of the Intent Stipulation; she noted that she "appreciate[d] that there's a diversity unit that's being created and established. I know as a junior firefighter in the firehouse the importance of that." (Hr'g Tr. at 62:19-23.)

Another class member explained that he was found eligible for priority hire relief, passed Exam 2000, and progressed through to the medical exam, but ultimately was rejected on the basis of his stairmill test results. (See id. at 74:7-76:24.) As noted above, supra Part III.A.2.d, Plaintiff-Intervenors and the United States have raised concerns that the FDNY's medical examination process, including the stairmill test, may have a disparate impact on black and Hispanic entry-level firefighter candidates. (See Ct. Monitor's Ninth Periodic Report at 4-5; Ct. Monitor's Tenth Periodic Report at 13-14; Ct. Monitor's Eleventh Periodic Report at 13-15.) The Intent Stipulation provides that candidates for the FDNY will be able to view their heart rates while the stairmill test is administered (Intent Stipulation ¶ 1(c)); this might have some positive impact with respect to the stairmill issue.

## IV.    CONCLUSION

The court has carefully considered Plaintiff-Intervenors' and the City's submissions, and all of the objections to the Intent Stipulation.  For the reasons discussed above, the court determines that the Intent Stipulation is lawful, fair, reasonable, adequate, consistent with the public interest, and not the product of collusion, and none of the objections thereto has sufficient merit to overcome the presumption of validity accorded to the agreement.  Therefore, Plaintiff-Intervenors' First and Second Motions for Final Entry of Intent Stipulation (Dkts. 1470, 1551) are GRANTED.  In a separate docket entry, the court will contemporaneously approve and enter the Intent Stipulation in order to resolve Plaintiff-Intervenors' intentional discrimination claims.

SO ORDERED.

s/ Nicholas G. Garaufis

Dated: Brooklyn, New York
      June _5_, 2015

NICHOLAS G. GARAUFIS
United States District Judge